UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

JASON MITCHELL, # 369197,          )
                                   )
            Petitioner,            )          Case No. 1:06-cv-854
                                   )
v.                                 )          Honorable Robert Holmes Bell
                                   )
CARMEN PALMER,                     )
                                   )          **REPORT AND RECOMMENDATION**
            Respondent.            )
_____)

      This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. On January 24, 2001, a Kent County Circuit Court jury found petitioner guilty of second-degree home invasion, MICH. COMP. LAWS § 750.110a(3), accessory after the fact to murder, MICH. COMP. LAWS § 750.505, accessory after the fact to assault with intent to commit murder, MICH. COMP. LAWS § 750.505, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, and two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On March 26, 2001, petitioner was sentenced as a habitual offender, second felony offense, to 12-to-22 years' imprisonment on his second-degree home invasion conviction and 3-to-7 years each for his accessory after the fact and carrying a concealed weapon convictions. These convictions are being served concurrently, but they are consecutive to petitioner's two-year prison terms on his felony firearm convictions.

      Petitioner's convictions arose from his May 24, 2000 invasion of Phillip Patterson's home and his involvement in the shooting of Phillip Patterson and Willie Patterson by Robert

Mitchell. The Michigan Court of Appeals summarized the facts giving rise to petitioner's convictions as follows:

> On May 24, 2000, Phillip Patterson was returning to his apartment when he observed a red Tempo automobile in his backyard by the garage. At the time, Phillip and his friend, George Woods, were traveling in a van driven by Phillip's neighbor. Phillip Patterson's neighbor cut through the alley behind Phillip Patterson's house and drove toward the red Tempo. As the van approached the Tempo, someone ran from the side of Phillip Patterson's garage and jumped into the passenger seat of the Tempo, which then began to move. The Tempo was forced to stop in the alley because another automobile was blocking its path. Phillip Patterson exited the van and approached the Tempo. He recognized Jason Mitchell as the passenger and briefly spoke with him.
>
> The defendants' cousin, Darnell Triggs, testified that, at Jason Mitchell's direction, he drove to an alley on May 24, 2000. They were in a red Tempo belonging to Joyce Mitchell, the defendants' mother. Triggs testified that he parked behind a garage and Jason Mitchell exited the Tempo. Jason Mitchell was gone for approximately ten minutes.[1] Jason Mitchell returned from the side of the garage, carrying a bag. When Jason Mitchell reentered the car, he put the bag on the floor and told Triggs to "take off." Triggs testified that he started to drive but was stopped in the alley because another vehicle was blocking the way. While Triggs was waiting for the other vehicle to move, a big man[2] walked up to the Tempo and talked to Jason Mitchell. Triggs did not pay attention to what was said in the short conversation. Triggs subsequently drove Jason Mitchell back to their grandmother's house.
>
> Phillip Patterson testified that, after speaking to Jason Mitchell in the alley, he returned to his apartment. He found the door open and the house ransacked. Several items were missing. At 6:10 p.m., Phillip Patterson called his brother, Willie Patterson, and informed him about the occurrence. Phillip Patterson also called Jason Mitchell because he wanted his missing items and believed Jason Mitchell was responsible for their disappearance. Between 6:19 p.m. and 6:34 p.m., several telephone calls were made back and forth between Phillip Patterson and Jason Mitchell while they tried to agree on a place to meet to discuss the missing items. They ultimately agreed to meet at a particular Kentucky Fried Chicken restaurant, which was within walking distance of Phillip Patterson's apartment house. At 6:35 p.m., Phillip Patterson telephoned Willie Patterson and told him about the location of the meeting. Willie Patterson arrived at the Kentucky Fried Chicken restaurant in a rented Intrepid automobile and had at least one passenger in the car with him.

---

[1] On cross-examination, Triggs testified that Jason Mitchell was gone for less than five minutes.

[2] Phillip Patterson weighed 280 pounds on May 24, 2000.

When Willie Patterson pulled into the parking lot, Jason Mitchell was outside of the Tempo, standing near one of the entry doors to the restaurant. Jason Mitchell was wearing a bulletproof vest and, according to some witnesses, was carrying a handgun in the waistband of his pants. Triggs was in the driver's seat of the Tempo and Robert Mitchell was leaning down in the back seat. Willie Patterson exited the Intrepid, approached Jason Mitchell and exchanged words with him. Jason Mitchell told Willie Patterson that he did not have any of Phillip Patterson's belongings. While they were conversing, Phillip Patterson drove his neighbor's van into the restaurant parking lot. Phillip Patterson exited the van and joined the conversation. Robert Mitchell admitted that Phillip Patterson was "pretty nice" and stated that Phillip Patterson did not want trouble, but only wanted his missing items returned. There was no physical confrontation during the conversation. Very shortly after Phillip Patterson arrived, Willie Patterson walked away from the conversation. He seemed upset and headed for a hole in the fence at the back of the parking lot. Willie Patterson's home was located in the direction he was walking.

As Willie Patterson walked away, Robert Mitchell exited the Tempo and began shooting in Willie Patterson's direction using an SKS assault rifle with a banana clip hanging from the bottom. It was undisputed that, when the first shots were fired, Willie Patterson was already running away from Robert Mitchell. Triggs noted that Willie Patterson started running after seeing Robert Mitchell with the weapon. He was running toward garbage cans at the back of the parking lot, a "nice" distance from the cars. A bullet that entered the back of his left shoulder and exited through his right cheek killed Willie Patterson. During the shooting, Phillip Patterson jumped into the van and attempted to move it. While he was doing so, Robert Mitchell shot into the driver's side window of the van, injuring Phillip Patterson. There was no evidence that either Phillip Patterson or Willie Patterson possessed weapons at the time of the shooting. The police recovered twenty 7.62 by 39 millimeter shell casings from the restaurant parking lot. All were determined to have been fired from the same weapon.

When the shooting started, Triggs left the Tempo and ran. He then decided to return to the parking lot. He noticed Willie Patterson on the ground, but did not see Robert Mitchell or the gun. Jason Mitchell was still in the parking lot and said that he could not believe Robert Mitchell shot the rifle. Jason Mitchell and Triggs abandoned the Tempo in the parking lot and ran to their grandmother's house together. While they were running, cutting through yards, Triggs saw Jason Mitchell throw a gun in some bushes. Triggs later turned himself over to the police and told them what he saw. He did so because he was afraid of defendants and thought they planned to harm him.

At trial, Robert Mitchell admitted that he shot Willie Patterson, that Willie Patterson was turning away and trying to run when the shooting started, and that Willie Patterson was headed toward the hole in the fence. Robert Mitchell claimed, however, that Willie Patterson had a reputation for being dangerous and for carrying a gun. Before Willie Patterson walked away from the conversation, Robert Mitchell heard Willie Patterson threaten to kill Jason

Mitchell.  Robert Mitchell subsequently saw Willie Patterson reach under his shirt while he was walking.  Robert Mitchell, believing that Willie Patterson had a gun, exited the Tempo and started shooting.  He closed his eyes after the first shot and kept his finger on the trigger.  He finally dropped the gun when he heard someone tell him to run.  Robert Mitchell testified that he did not remember shooting Phillip Patterson at all.

(Op. at 2-4, docket # 1, Pet. Ex. # 1).  The jury convicted petitioner as previously indicated.  Robert Mitchell was convicted of the second-degree murder of Willie Patterson, assault with intent to murder Phillip Patterson, and two counts of possession of a firearm during the commission of a felony.

Petitioner argues that he is entitled to federal habeas corpus relief on seven grounds:

I. Insufficiency of the evidence to support petitioner's second-degree home invasion conviction;

II. A violation of petitioner's due-process rights by erroneous admission of rebuttal evidence;

III. A violation of petitioner's due-process rights by prosecutorial misconduct in closing argument;

IV. Petitioner's joint trial with his brother violated his due process rights;

V. Petitioner's sentence of 12-to-22 years as a habitual offender, second felony offense on his second-degree home invasion conviction violated his rights under the Eighth Amendment's Cruel and Unusual Punishments Clause;

VI. Petitioner's second-degree home invasion sentence was based on judicial fact-finding in violation of *Blakely v. Washington*, 542 U.S. 296 (2004);

VII. Appellate counsel was constitutionally ineffective because he failed to raise on direct appeal the issues petitioner later raised in his motion for post-conviction relief under Rule 6.500 of the Michigan Court Rules.

Respondent has filed an answer to the petition (docket # 15) asserting that Grounds I and II are meritless and that all the remaining grounds are barred by procedural defaults, not overcome by a showing of cause and prejudice or actual innocense.  Upon review of the state-court record, I find

that all grounds raised by petitioner are devoid of substance and recommend that the petition be

denied on its merits.[3]

## Proposed Findings of Fact

### A.    Trial Court Proceedings

On November 15, 2000, Judge Dennis C. Kolenda of the Kent County Circuit Court

conducted a hearing on a number of pretrial motions, including a motion to sever petitioner's trial

from his brother's trial.  Robert Mitchell's attorney argued in favor of separate trials because the

evidence at the June 9, 2000 preliminary examination (docket # 20) did not connect Robert Mitchell

to the home invasion.  (HT, 17-22, docket # 22).  The prosecutor responded that a joint trial was

appropriate under the Michigan Court Rules.  The invasion of Phillip Patterson's home occurred

shortly before the shootings and served as the catalyst. (HT, 24-26).  Petitioner's counsel argued that

trying petitioner with Robert Mitchell was more prejudicial than probative.  (HT, 27).  Judge

Kolenda held that a joint trial was appropriate under Michigan Court Rules 6.120 and 6.121 and that

the joint trial would not prejudice either defendant.  (HT, 28-30).

Petitioner's trial began on January 8, 2001, and concluded on January 24, 2001, with

verdicts finding him guilty of second-degree home invasion, accessory after the fact to murder,

accessory after the fact to assault with intent to commit murder, carrying a concealed weapon, and

---

[3] It is not necessary to address petitioner's procedural defaults of failing to make contemporaneous objections during trial and failing to raise issues on direct appeal.  The district court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question. *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008); *see also Arias v. Hudson*, ___ F.3d ___, No. 08-4513, slip op. at 3 (6th Cir. Dec. 16, 2009)(citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  In the present case, petitioner's claims are indisputably meritless, so analysis of the complicated procedural default issue is unnecessary.

two counts of possession of a firearm during the commission of a felony. (Trial Transcripts, TT I-XI, docket #'s 23-34). The evidence supporting the verdicts is summarized below.

1.  Invasion of Phillip Patterson's Home

On the afternoon of May 24, 200, Phillip "PJ" Patterson had a brief encounter and conversation with petitioner while Patterson was on his way to the Laundromat. (TT IV, 79). Patterson went back to his apartment between the laundry cycles. He locked his apartment door when he went to retrieve his clothes from the dryer. He was away from home approximately 20 to 30 minutes. (TT IV, 89). As Phillip Patterson was returning to his apartment, he noted that a red Tempo was parked in the alley behind it. (TT IV, 85). He saw someone run and jump into the front passenger seat as the Tempo began pulling away. The two men in the Tempo were not able to get away because another car was blocking the alley's exit. Phillip Patterson went to investigate. He found petitioner, whom he recognized, slumped down in the Tempo's passenger seat. Phillip did not know the driver. (TT IV, 85- 87, 142-43, 162). He testified that petitioner appeared reluctant to engage in conversation and "just looked real shocked." (TT IV, 88). After the unidentified man and petitioner drove away, Phillip Patterson returned to his apartment and found that it had been ransacked and the door left wide open. (TT IV, 88). He testified that a gold chain, marijuana, $200 in cash and a "CD changer" were missing. (TT IV, 89, 166). Phillip Patterson called petitioner on his cell phone and demanded the immediate return of the stolen items. (TT IV, 91-92).

Darnell Triggs, petitioner's cousin, testified that he was the driver of the red Tempo and that petitioner was his passenger. The car belonged to Joyce Mitchell, petitioner's mother and Triggs's aunt. (TT V, 6). Petitioner directed Triggs to drive into the alley and told him to park

-6-

behind a garage. (TT V, 71). Petitioner then left the car for five to ten minutes. (TT V, 7-8, 71). Petitioner left with empty hands but returned holding a bag. (TT V, 8-9, 72). Petitioner put the bag on the floor of the car and instructed Triggs to "take off." (TT V, 9). Triggs testified that he and petitioner were not able to make an immediate escape from the alley because a car was blocking the exit. (TT V, 69). A large man approached the Tempo and spoke with petitioner. (TT V. 10-11). A short time after petitioner and Triggs left the alley, petitioner began receiving telephone calls from Phillip Patterson. (TT V, 11).

### 2. Preparations for the Meeting with Phillip and Willie Patterson

Telephone records revealed that between 6:10 p.m. and 6:35 p.m. petitioner and Phillip Patterson exchanged a series of telephone calls. (TT VIII, 79-80). They discussed potential locations for a meeting. Petitioner refused to meet Phillip Patterson at Patterson's apartment. (TT IV, 93). Petitioner proposed four alternative locations: Cass Street (his grandmother Trudy Mitchell's house), Horton Street (his mother Joyce Mitchell's house), a Popeye's restaurant, and finally the Kentucky Fried Chicken (KFC) restaurant where the Patterson brothers were eventually shot. (TT IV, 93).

Darnell Triggs testified that he drove petitioner to Joyce Mitchell's house on Horton Street where they picked up Robert "Boopie" Mitchell, petitioner's brother and Triggs's cousin. (TT V, 12, 73-74). Triggs remained in a front room while petitioner and his brother went into another area of the house. (TT V, 13). Petitioner returned wearing a bulletproof vest. Triggs testified that petitioner was known to carry a handgun. Triggs observed Robert Mitchell sitting in the Tempo's back seat with a big, long gun on the floor that he was attempting to conceal with a towel. (TT V,

14-16, 23, 76).  A subsequent search of the Horton Street residence yielded a large magazine or banana clip containing 29 cartridges and an empty box of cartridges, all matching the twenty spent casings police found in the KFC parking lot.  (TT VI, 113).  All the casings had been fired from the same gun.  (TT VII, 168-71).  Police found other ammunition matching that found in the handgun discarded approximately a block from the KFC.  (TT VII, 203).

Darnell Triggs testified he stopped at his grandmother Trudy Mitchell's  house on Cass Street and that petitioner and Robert Mitchell went inside.  (TT V, 13).  When the three men left Trudy Mitchell's house, Triggs was driving, petitioner was in the front passenger seat, and Robert Mitchell was in the back seat with the assault rifle.  (TT V, 15-17, 49).  Robert "hunched low" in the back seat as Triggs drove into the KFC parking lot.  (TT V, 48, 50, 86).

### 3.  Shootings at the Kentucky Fried Chicken Restaurant

Before the Pattersons arrived at the KFC, petitioner went inside the restaurant.  (TT IV, 4, 45-46, 180, 183; TT V, 52).  Willie Patterson arrived in an Intrepid sedan and was accompanied by Michael Ruffin.  (TT V, 52; TT IV, 180, 183).  Willie Patterson got out of the car and met with petitioner near the restaurant entrance.  (TT V, 54, 77).  Willie was demanding the return of his brother's "stuff."  (TT IV, 178; TT VII, 49).  Triggs testified that from his body language and hand movements it was apparent that Willie was upset.  (TT V, 54-56).  Ruffin overheard Willie inquiring why petitioner had a gun and was wearing a bulletproof vest.  Ruffin testified that petitioner appeared to be wearing a bulletproof vest.  (TT VI, 184-85, 194-95; TT VII, 59).

Phillip Patterson and George Woods arrived in a van. (TT IV, 173-76, 181; TT IV, 173, 195-96). Petitioner and Willie were outside the restaurant. (TT IV, 199). Phillip could see that petitioner was wearing a bulletproof vest under his T-shirt and that he had a handgun sticking out of his waistband. (TT IV, 103, 144-47, 184). Phillip Patterson stepped out of the van, but he left the engine running. Woods remained behind in the van's passenger seat. (TT IV, 187). Phillip saw Willie start walking away towards a hole in the fence. Petitioner walked back to the Tempo and sat in the front passenger seat. Petitioner appeared to say something to Robert. Robert Mitchell then opened the car door and jumped out with the assault rifle. Robert pointed the gun at Willie Patterson's back and started shooting. (TT IV, 110-12). Triggs testified that Robert Mitchell emerged from the Tempo and fired the assault rifle less than a minute after Triggs spoke to petitioner. (TT V, 17, 20, 58-59). Witnesses' testimony established that Willie Patterson died in the KFC parking lot from a gunshot wound to his head and neck. (TT V, 117-20; TT VI, 28).

Phillip Patterson jumped into the van and tried to drive away, but before he had it in reverse, Robert Mitchell was standing outside the driver's window. Robert let loose a second volley of gunfire, wounding Phillip Patterson in his chest and left forearm. (TT IV, 114-16; TT V, 98-100; TT VI 8-9, 12). Steve Lohman witnessed the shooting. He testified that the shooter fled the scene on foot. (TT VI, 42-44).

Darnell Triggs testified that he ran away while Robert was shooting. Later, when Triggs returned, Robert Mitchell was gone. (TT V, 59, 61). Triggs did find petitioner. They abandoned the Tempo in the KFC parking lot and fled together on foot, cutting through yards and ending up back at Trudy Mitchell's house. (TT V, 22, 25). Triggs testified that while he and petitioner were running, he saw petitioner throw a handgun towards some bushes. (TT V, 26).

William Morrissey later found the handgun in his back yard. (TT VII, 117, 123; TT VIII, 9-10). Initially, Triggs did not testify about seeing petitioner running away with the assault rifle, but he later conceded that if he had told that to the police, that was what had happened:

> Q      If you told the police before that you saw Jason run with the long gun with a towel over it, if you told them that back on May 26th of last year?
>
> A      If that's what I said, that's what happened.

(TT V, 42).

Michael Ruffin testified that he saw petitioner running away from the KFC carrying a long gun with a large ammunition clip. (TT VI, 187-88). Other witnesses observed that one of the two men running across Division Street was carrying a rifle. (TT VI, 55, 61). David Jacobs saw a man walking very fast across the street carrying a cloth-wrapped bundle. (TT V, 90-95). Police later found a towel on Division Street. (TT VII, 129).

Triggs testified that after the shootings, he and petitioner stayed briefly at Trudy Mitchell's house before moving on to their uncle Oscar Mitchell's house. (TT V, 29-30). Police found Joyce Mitchell's red Tempo in the KFC parking lot. (TT VI, 84, 98). A bulletproof vest and live rounds of ammunition were in plain view in the car's back seat. (TT VI, 108-10, 133).

4.      <u>Darnell Triggs Seeks Police Protection</u>

A day after the shootings, Darnell Triggs received a telephone call from petitioner. Immediately thereafter, Triggs sought police protection. (TT V, 34). Patrolman Eric Grunewald responded to Triggs's call. Triggs disclosed that he knew the identity of the man who shot and killed another man at a Grand Rapids KFC and began providing details surrounding the shootings. (TT IV, 209-211). Triggs appeared to be very nervous and wanted police protection. (TT IV, 208).

Triggs was transported to the Grand Rapids Police Department where he provided police with additional information regarding the shootings. (TT IV, 220; TT V, 32).

### 5. Attempts by Petitioner and the Mitchell Family to Secure Perjured Testimony

A week before Triggs was scheduled to testify at petitioner's trial, petitioner called Triggs on the telephone and tried to persuade Triggs to commit perjury. (TT V, 35-39).

Alphonso Edwards testified that he had been contacted by members of petitioner's family and was asked to supply false testimony that he had sold petitioner a stereo in the alley behind Phillip Patterson's apartment on the day the shootings occurred. (TT VIII, 47-48, docket # 31). Edwards used the alias of Alvin Thomas and he had been listed as a witness for petitioner under that name. (*Id.* at 29, 32). On the third day of petitioner's trial, inside the courthouse, Detective Griffin had a conversation with Edwards which he recorded. Before this conversation, Edwards had planned to come into court under his assumed name of Alvin Thomas and to provide the false testimony petitioner's family had requested. (*Id.* at 34). Edwards decided to abandon the phony story when he learned that police had recorded petitioner's telephone calls from the Kent County Jail. Edwards testified that the whole stereo story was false and that he never seen petitioner on the date of the shootings:

Q    Mr. Edwards, you were picked up [and locked up in the Kent County jail] because you told Detective Griffin that you weren't gonna come in and testify once you told him the truth, right?

A    I told him it wasn't my business, I didn't have nothing to do with the case and I didn't want to get up here, which I don't. If I didn't know nothing to do about this case, then what the hell am I doing up here?

Q    Well, Mr. Edwards, we came and talked to you because you were listed as a defense witness for Jason Mitchell. You understand that?

-11-

A Right, then I changed it over with him. I told him I didn't have nothing to do with it, I didn't know nothing about the case, I didn't know anything. I didn't even know what's going on.

Q Before Detective Griffin talked to you, you were planning to testify that you gave Jason Mitchell a stereo in some alley, correct?

A Yeah, true.

Q And that it was on the day of some shooting?

A And that before it happened I told him that it really didn't happen, yeah, I didn't see Jason, and I told him that.

(*Id.* at 33-34).

After the prosecution rested, Robert Mitchell called Regina McNairy and Leisa Mitchell as witnesses. McNairy testified that she was married to Robert Mitchell's father. She stated that petitioner was like a father figure to Robert. (TT X, 5, docket # 32). Leisa Mitchell testified that she was related to Robert Mitchell and that Robert looked up to petitioner as "an all-around father, mother-type figure." (*Id.* at 70-71). Robert Mitchell testified in his own defense. (*Id.* at 6-74). He admitted that he shot Willie Patterson, but claimed that he had been defending petitioner. (*Id.* at 16). Robert testified that he had never seen petitioner carry a gun. (*Id.* at 24). Upon cross-examination, he admitted that he heard Triggs's preliminary examination testimony and he knew that Darnell Triggs was the only witness who had identified him as the shooter. (*Id.* at 32-33). Robert Mitchell admitted writing a letter to his mother instructing her to tell Triggs to "start lyin' for everything. For he can get impeached. Or tell them he was just sayin' that because he was scared they might lock him up." (*Id.* at 26). In another letter, Robert instructed his mother to "Tell him he's not sure who did it. Ask him do he want me to come home." (*Id.* at 29). On cross-

examination, Robert Mitchell admitted that he asked his mother to contact his friends "Pooh" and

"Joe" and convince them to testify that they saw someone taking a gun off Willie Patterson's body:

> Q    So you were hoping that your mom would get Pooh and Joe to come in here and lie
> and say that they saw a gun being taken off the victim, right?  That was the purpose
> of that?
>
> A    Right.

(*Id.* at 32).

Petitioner called his grandmother, Trudy Mitchell, as a witness.  She testified that

petitioner, Robert Mitchell, and Darnell Triggs were three of her grandchildren.  She testified that

years earlier, Triggs had suffered head injuries in a car accident.  She described Triggs as "real

paranoid."  (TT X , 83, docket # 32).  Petitioner's counsel elicited testimony from Trudy Mitchell

that Darnell Triggs had no rational reason for fearing petitioner:

> Q    Now is there anything you can tell this jury why Darnell should be afraid of being
> killed by Jason Mitchell?
>
> A    There's no reason, other than he's paranoid.  He's not on his medication and he just
> think that we against him.  His family is not against him.  We love Darnell very
> much.

(*Id.* at 84).  Trudy Mitchell reiterated on cross-examination that she did not know of any reason why

Darnell Triggs should be afraid of petitioner.  (*Id.* at 88).  She testified that she had no knowledge

of a December 1999 incident in which Triggs had witnessed petitioner pistol-whipping another man.

(*Id.*).

The prosecutor called Mary Goree as a rebuttal witness.  (TT X, 90, docket # 32).

Outside the presence of the jury, the prosecutor summarized Ms. Goree's anticipated testimony.  (*Id.*

at 91-93).  The defendants' attorneys objected.  (*Id.* at 93-101).  Judge Kolenda ruled that Ms.

Goree's anticipated testimony would be proper rebuttal:

> The reality here is that this proposed testimony directly responds to several things said by one or the other defenses here.  It is in direct response to the testimony by people that Jason was never seen with a gun.  It's also in direct response to an effort to portray the character of both these young men as contrary to what was exhibited, if the prosecution's proofs are to be believed, in the parking lot of the Kentucky Fried Chicken on South Division.  It is also in direct response to the testimony that Darnell [Triggs] should not be believed because he is irrationally conjuring reason to fear Jason and/or Robert, when, in fact, if the jury believes this testimony, it could also believe he had plenty of reason to fear them and, therefore, he's not being paranoid when he expresses some fear.  And if he's not paranoid in that regard, then the attack on his credibility in general might be far less persuasive.
>
> In short, because the evidence responds directly to things that were claimed by defense witnesses, it's appropriate for the prosecution to rebut the evidence unless there is unfair prejudice.

(*Id.* at 104-05).  Judge Kolenda ruled that the probative value of Ms. Goree's testimony was not

outweighed by the danger of unfair prejudice.  (*Id.* at 105-07).  Mary Goree testified that on

December 7, 1999, at a Knights Inn in Grand Rapids, Darnell Triggs had witnessed petitioner pistol-

whip her boyfriend Benjamin "Bennie" Clark, leaving Clark on the floor and bleeding profusely

from a head wound.  (*Id.* at 109-14).

### 6. Closing Arguments and the Jury's Verdicts

On January 23, 2001, the attorneys delivered their closing arguments.  The prosecutor

gave her closing argument without any objection by counsel for either defendant (TT XI, 3-54,

docket # 33).  Robert Mitchell's attorney argued that Robert had been defending petitioner.  (*Id.* at

55-80).  Petitioner's attorney argued that the evidence was insufficient to support a conviction for

second-degree home invasion.  (*Id.* at 81-88).  Further, he argued that the shootings at the KFC were

not an ambush:

-14-

I'm surprised this morning that I didn't hear from the government's side the word "ambush." I don't know if she abandoned that theory or that she's going with a new theory, but I didn't hear her saying that.

I tried to tell you at the beginning of this trial what ambush means. Mr. Dodge covered that area. But everybody knows ambush means attack from a concealed position or attack by surprise. I don't think that the parking lot of the Kentucky Fried Chicken on Division Street or Division Avenue at 5:25 on May 24, daylight, is a place to ambush someone.

* * *

In the Kentucky Fried Chicken, the famous ambush thing falls apart, and you know why. There's no witnesses that say and that can tell here and have said to you that there was an agreement or conspiracy that they all agreed to do this or that. And the ambush theory is bigger than that, because Kentucky Fried Chicken at 5:30 -- 5:30 in the afternoon, in the middle of Division Avenue, is not a place [] to ambush anyone. So, that falls apart.

(*Id.* at 81, 88). Near the end of his argument, petitioner's counsel emphasized that Trudy Mitchell's

testimony showed that Darnell Triggs was being paranoid when he claimed that he was afraid of

petitioner:

Trudy Mitchell has 27 grandchildren. A lady that can't be discredit[ed] by the government. A lady that tells you that she love[s] all her grandchildren, including Darnell, Jason Mitchell and his brother. A lady that tells you that Mr. Darnell Triggs -- Darnell is kind of paranoid sometimes. He does have episodes. Well, that's not inconsistent [with] what the police officer testified in court. The person from the Wyoming Police Department that went to pick him up at the apartment [s]aid I know there's something wrong with him. Remember when he said that? He sa[id], he looks like paranoid. He see[m]s paranoid. The same thing that Trudy Mitchell is telling us. He has some episodes.

The fact that he's telling you, or he said I'm afraid of Jason. I'm afraid his brother. It's in his mind. We don't have any evidence that would lead you to believe that he's got to be afraid of Jason. Regardless of that, we aren't judging Jason Mitchell for Darnell being afraid of him. We are judging Jason Mitchell for breaking and entering, carrying a concealed weapon and accessory after the fact.

(*Id.* at 94-95). Petitioner's counsel asked the jury to return a verdict finding petitioner not guilty on

all charges.

The prosecutor gave a brief rebuttal argument. (TT XI, 96-109). She argued that defense counsels' closing arguments were deficient because they ignored significant evidence presented by the prosecution:

> MS. KONICKI: The law says that because I have the burden of proof, I get to respond briefly to their arguments, not make additional argument on what I already said.
>
> One thing I have to respond to is this. Just because you have more evidence, doesn't make it go away. Did you hear anybody explain to you why nine millimeter cartridges that matched identically to the ammo in that weapon found behind Green Street was found at Jason's mom's house?
>
> Did anybody explain to you why a weapon matching the exact description given by the witnesses at the scene would be found behind where this nine millimeter is later found by just some guy mowin' his lawn?
>
> Did anybody explain to you, if Jason had some legitimate reasons for being out there, why he was out there on Putnam? No. They have to ignore it because they can't tell you. All they can explain is guilt.
>
> MR. FERRER: Your Honor, we have to object, because I think she's crossing the line because the -- the defense does not have to prove evidence to the jury.
>
> THE COURT: She's simply commenting on the argument which has been made. I believe it is an appropriate comment.
>
> MS. KONICKI: Did they tell you that in response to Mr. Ferrer's argument, what he told you about Darnell had no reason to be paranoid. Darnell had no reason to be paranoid or fearful of Jason or Robert? Are you kiddin'? He may have been their relative, he may have grown up with them, but he knows them better than anybody in this courtroom.
>
> And he, five months before watched as Jason Mitchell pistol whipped a man who had just got[ten] into a shoot-out with him until the man is under a sink and bleeding all over the place and his injuries required what? Tons of stitches, and staples, and all this other stuff. And you mean to tell me Darnell Triggs, as he stands there and watches this, doesn't register to him that Jason is a dangerous person. Is that paranoia or is that a fact.

(*Id.* at 95-97). Her rebuttal to petitioner's counsel's argument that no witness had testified as to a "conspiracy" was that petitioner was not on trial for a criminal conspiracy. (TT XI, 102-04).

-16-

Judge Kolenda delivered the jury instructions without objection.[4] (TT XI , 110-99). He reminded the jury that the attorneys' arguments were not evidence. He instructed that petitioner was presumed innocent and that the prosecution had the burden of proving his guilt beyond a reasonable doubt. (*Id.* at 143-46). He advised the jury that the charges against each defendant must be considered separately. (*Id.* at 142-43). Petitioner had the right not to testify and his decision against testifying could not be held against him. (*Id.* at 138). The judge instructed the jury on all the elements of the charges against petitioner. (*Id.* at 148-57). On January 24, 2001, the jury returned a verdict finding petitioner guilty on all charges. (TT XI, 18, docket # 34).[5]

### 7. Sentencing

Petitioner appeared for sentencing on March 26, 2001. (ST, docket # 35). Judge Kolenda found substantial and compelling reasons for an upwards departure from Michigan's sentencing guidelines. (ST, 25-28). He respected the jury's verdict finding that a planned ambush had not been proven beyond a reasonable doubt, but he found that, for sentencing purposes, the prosecution had shown by more than a preponderance that the shootings of Willie and Phillip Patterson had been an ambush. Petitioner was armed and wearing a bulletproof vest, his brother was

---

[4] Robert Mitchell's attorney reiterated an earlier objection that the jury instructions regarding the assault with intent to commit murder charge against Robert should include an instruction on felonious assault as a lesser included offense. Judge Kolenda repeated his earlier ruling that the facts of this case did not support the requested instruction. (TT XI, 199).

[5] The jury found Robert Mitchell guilty on all charges and the court sentenced him to concurrent terms of 30-to-75 years on his second-degree murder and assault with intent to murder convictions and two consecutive terms of two years each for possession of a firearm during the commission of a felony. His conviction and sentence were upheld by Michigan's appellate courts. This court denied Robert Mitchell's petition for federal habeas corpus relief. *See Mitchell v. Renico*, 1:05-cv-47, 2006 WL 1521752 (W.D. Mich. May 31, 2006).

hiding in the back seat of the Tempo with the assault rifle, and the victims were directed to the location where the shootings occurred through a series of telephone calls. (ST, 25-26). Further, Judge Kolenda found that Michigan's sentencing guidelines failed to adequately take into account petitioner's eighteen misdemeanor convictions. (ST, 26). Petitioner's prior felony conviction was unchallenged, and the maximum penalty under state law for second-degree home invasion by a second felony offender was 22½ years' imprisonment. *See* MICH. COMP. LAWS §§ 750.110a(6), 769.10(a). Judge Kolenda sentenced petitioner below the statutory maximum authorized by the jury verdict. He sentenced petitioner to 12-to-22 years' imprisonment on the second-degree home invasion conviction and 3-to-7 years each for his convictions for accessory-after-the-fact and carrying a concealed weapon. These sentences were to be served concurrently. Petitioner's two-year prison terms on his felony-firearm convictions were to be served consecutively. (ST, 26-28).

B. **Appellate Proceedings**

Petitioner appealed as of right to the Michigan Court of Appeals. Appellate counsel raised the following issues:

I. DID THE PROSECUTION FAIL TO PRODUCE SUFFICIENT EVIDENCE AT TRIAL TO SUSTAIN A JURY VERDICT, FINDING DEFENDANT GUILTY BEYOND A REASONABLE DOUBT OF THE CRIME OF SECOND DEGREE HOME INVASION [IN VIOLATION OF] MCLA 750.110a(3)?

II. MUST DEFENDANT'S CONVICTION BE REVERSED DUE TO THE ERRONEOUS ADMISSION OF IMPROPER REBUTTAL EVIDENCE BY THE TRIAL COURT ON A COLLATERAL MATER WHICH RESULTED IN A MISCARRIAGE OF JUSTICE AND DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL?

III. WAS DEFENDANT DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS BY INTENTIONAL

PROSECUTORIAL MISCONDUCT WHERE THE PROSECUTOR ENGAGED IN IMPROPER AND HIGHLY PREJUDICIAL ARGUMENT TO THE JURY WHERE SHE EXPRESSED HER PERSONAL BELIEF IN HIS GUILT, SHIFTED THE BURDEN OF PROOF, ARGUED FACTS NOT IN EVIDENCE, AND DENIGRATED THE DEFENDANT, HIS WITNESSES[,] HIS DEFENSE AND HIS PRESUMPTION OF INNOCENCE, AND MADE IMPROPER AND INFLAMMATORY REBUTTAL ARGUMENT?

IV.   WAS DEFENDANT'S SENTENCING PROCEEDING TAINTED BY REVERSIBLE ERROR WHERE THE TRIAL COURT:

    A.   MADE AN INDEPENDENT FINDING OF GUILT ON OTHER UNCHARGED CONDUCT TO JUSTIFY ITS SENTENCE DEPARTURE ON HIS SECOND-DEGREE HOME INVASION CONVICTION IN THE INSTANT CASE;

    B.   FAILED TO INDIVIDUALIZE DEFENDANT'S SENTENCE OR ARTICULATE SUBSTANTIAL AND COMPELLING REASONS FOR DEPARTURE FROM THE STATUTORY GUIDELINES RANGE EITHER ON THE RECORD OR IN WRITING AS REQUIRED BY STATUTE;

    C.   DEPARTED FROM THE LEGISLATIVE SENTENCING GUIDELINES RANGE BASE ON REASONS THAT ARE NOT AUTHORIZED BY THE SENTENCING GUIDELINES STATUTE;

    D.   VIOLATED THE CONCEPT OF PROPORTIONALITY IN IMPOSING 12-22 YEAR SENTENCE FOR HIS SECOND-DEGREE HOME INVASION CONVICTION?

(Defendant-Appellant's Brief on Appeal at vi, found in Court of Appeals record, docket # 36).

On August 21, 2003, the Michigan Court of Appeals issued an unpublished opinion affirming petitioner's conviction and sentence. It rejected petitioner's argument that the evidence was insufficient to support his second-degree home invasion conviction:

[T]he evidence established that, earlier in the day on May 24, 2000, Phillip Patterson spoke to Jason Mitchell. At the time, Phillip Patterson was in a truck and was driving home from a Laundromat where his clothes were in the washing machine. When Phillip Patterson later left his apartment to pick up his laundry, he locked his door with a key. He did not give anyone permission to enter. When Phillip Patterson returned, the door was open, the

apartment was ransacked, and several items were missing. The vehicle in which Jason Mitchell was traveling was seen parked by Phillip Patterson's garage during the relevant time frame. There was only a twenty- to- thirty minute interval between the time Phillip Patterson left to pick up his laundry and the time he returned to his apartment. Triggs testified that, during that interval, Jason Mitchell left the Tempo, which was parked by Phillip Patterson's garage, and was gone for approximately ten minutes. Jason Mitchell was empty-handed when he left the car, but returned with a bag that he placed on the floor before telling Triggs to "take off."

There was also evidence that, after Jason Mitchell was charged with the second-degree home invasion, he tried to influence Triggs' testimony. Jason Mitchell wanted Triggs to say that they were driving and were "flagged down" by a man who tried to sell Jason Mitchell a stereo in the alley. Triggs testified that the stereo story was a lie. At trial, Alphonso Edwards, a close friend of the Mitchell family, testified that he was supposed to testify that he saw Jason Mitchell on May 24, 2000, and tried to sell him a stereo that was in a bag. Edwards testified that he changed his mind about falsely testifying because he did not know anything about the case. Evidence of a defendant's attempt to suppress testimony, influence testimony, or induce perjury is admissible as evidence of consciousness of guilt. Viewed most favorably to the prosecution, we conclude that the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Jason Mitchell was guilty of second-degree home invasion in connection with the breaking and entering of Phillip Patterson's apartment.

(Op. at 5).

The Michigan Court of Appeals found no error in the trial court's decision allowing

Mary Goree's rebuttal testimony, much less error depriving petitioner of a fair trial:

In presenting their cases, the defendants tried to portray themselves as loving brothers who looked out for each other and were not violent, unlike Willie Patterson. They also attempted to dismiss Triggs' testimony that he was afraid of them. Jason Mitchell called Trudy Mitchell, the grandmother of Triggs and the defendants. Jason Mitchell's counsel asked Trudy Mitchell whether there was any reason why Triggs would be afraid of being killed by Jason Mitchell. Trudy Mitchell replied that there was no reason other than Triggs' paranoia.

The trial court, citing [*People v.*] *Figgures*, [547 N.W.2d 673 (Mich. 1996)] determined that the proposed rebuttal testimony of Mary Goree was responsive to the defendants' theories that Jason Mitchell was never seen with a gun, that the defendants had characteristics contrary to those they portrayed, and that Triggs had no reason to fear defendants except for his own paranoia. Goree was thereafter allowed to testify that Triggs was with both defendants when Jason Mitchell pistol-whipped Goree's boyfriend and Robert Mitchell repeatedly kicked him. The rebuttal evidence directly contradicted Trudy[] Mitchell's testimony that Triggs had no reason to fear the defendants. Indeed, he had seen them

participate in acts of extreme violence. The evidence also contradicted and disproved evidence produced by the defendants in which they attempted to portray themselves as nonaggressive. The rebuttal evidence was properly responsive to the theories and themes that defendants introduced and its admission was not an abuse of discretion.

(Op. at 10-11).

The Michigan Court of Appeals rejected petitioner's due-process claims based on alleged instances of prosecutorial misconduct. The Court of Appeals held that only one of the purported instances of misconduct had been properly preserved for appellate review by an objection. The rebuttal in question was proper because it was fair comment designed to call the jury's attention to the fact that, while defense counsel tried to explain away some of the incriminating evidence, they did not address or explain all of it. The Michigan Court of Appeals conducted a plain error review of the remaining prosecutorial misconduct claims. It found that none of the alleged instances of prosecutorial misconduct deprived petitioner of a fair trial:

Jason Mitchell argues that the prosecutor engaged in improper and highly prejudicial closing arguments. He refers to several portions of the prosecutor's closing argument and argues generally that the challenged excerpts denigrated him and his defense, denigrated the presumption of innocence, and placed the prestige of the prosecutor's office behind the prosecutor's personal conclusions with respect to the case. Jason Mitchell also sets forth general legal principles governing the issue of prosecutorial misconduct. He does not, however, relate these principles to the challenged portions of argument. Rather, he announces his positions and leaves it to this Court to discover and rationalize the basis for his various claims. This is insufficient to properly present this issue for our review. Moreover, we note that Jason Mitchell's trial counsel failed to object to all but one of the arguments challenged on appeal. Where a defendant fails to object to alleged misconduct by the prosecutor, review is for plain error. A defendant must show that error occurred, that the error was clear or obvious, and that the plain error affected his substantial rights. "It is the defendant who bears the burden of persuasion with respect to prejudice." Here, we conclude, Jason Mitchell has not met his burden of establishing plain error requiring reversal.

With respect to the one preserved issue of prosecutorial misconduct, concerning the prosecutor's rebuttal, we review the challenged rebuttal argument in context to determine whether a defendant received a fair and impartial trial. A prosecutor's comments are to be considered in light of defense counsel's arguments.

## B. The Prosecutor's Rebuttal

In closing, Jason Mitchell's counsel argued that the evidence did not support his guilt for either home invasion or CCW during the altercation at the Kentucky Fried Chicken restaurant. In his argument, counsel attempted to explain away much of the incriminating evidence. In rebuttal, the prosecutor argued:

> One thing I have to respond to is this. Just because you have more evidence, doesn't make it go away. Did you hear anybody explain to you why nine millimeter cartridges that matched identically to the ammo in that weapon found behind Green Street was found at Jason's mom's house?

> Did anybody explain to you why a weapon matching the exact description given by the witnesses at the scene would be found behind where this nine-millimeter is later found by just some guy mowin' his lawn?

> Did anybody explain to you, if Jason had some legitimate reasons for being out there, why he was out there on Putnam? No. They have to ignore it because they can't tell you.

We conclude that, evaluated in light of the defense arguments, the prosecutor's rebuttal argument was fair comment designed to call the jury's attention to the fact that, while defense counsel tried to explain away some of the incriminating evidence, he did not address or explain all of it. The prosecutor did not improperly place the burden on Jason Mitchell to explain the evidence. Instead, she pointed out that his attempt to do so was incomplete and that he ignored certain evidence. In addition, the jury was later instructed that the lawyers' arguments are not evidence to be considered in reaching a verdict. We conclude that the prosecutor's argument in her rebuttal did not deny Jason Mitchell a fair trial.

(Op. at 5-7) (footnotes omitted).

The Michigan Court of Appeals found no merit in petitioner's challenges to his sentence on his second-degree home invasion conviction. It found: (1) the judge did not make an independent finding of guilt on uncharged conduct in order to justify his departure from Michigan's sentencing guidelines; (2) the judge made an individualized determination and gave substantial and compelling reasons for his departure; (3) the upward departure was based on authorized reasons; and (4) petitioner's sentence of 12-to-22 years was proportionate:

Jason Mitchell argues that resentencing is required for his second-degree home invasion conviction. The trial court departed from the recommended minimum sentence range of 29 to 71 months' imprisonment under the legislative sentencing guidelines and sentenced Jason Mitchell to 12 to 22 years' imprisonment. We conclude that the trial court complied with the applicable statute when it departed from the recommended minimum sentence range under the guidelines.

First, the trial court properly articulated its reasons for departing from the recommended range. The prosecutor requested an upward departure because Jason Mitchell's conduct with regard to the home invasion precipitated the subsequent assault and murder. The trial court responded by noting that Jason Mitchell had eighteen prior misdemeanor convictions, most of which were not scored when the guidelines were calculated. The trial court therefore determined that Jason Mitchell's prior criminal history was not adequately taken into account by the guidelines. More importantly, the trial court noted that the facts presented at trial showed that the incident at the Kentucky Fried Chicken restaurant was an ambush and that Jason Mitchell was part of that ambush. The trial court determined that these circumstances surrounding the home invasion were not contemplated by the guidelines. The trial court subsequently articulated that, under the circumstances, it was entitled to depart from the recommended minimum sentence range.

Second, the trial court's reasons for departure were based on objective and verifiable facts. Jason Mitchell's misdemeanor record was extensive. The presentence investigation report indicates that he has eighteen prior misdemeanor convictions in addition to one prior felony conviction and a juvenile record. On appeal, Jason Mitchell does not dispute that the guidelines failed to account for all of his criminal history. In addition, the objective facts indicate that the home invasion was the event that precipitated the later violence. Moreover, even if Robert Mitchell did not have a plan of action at the Kentucky Fried Chicken restaurant, the evidence showed that Jason Mitchell arrived at the meeting prepared for a shooting. It was undisputed that, before the planned meeting, several telephone calls were made between Jason Mitchell and Phillip Patterson. They tried to agree on a meeting place to discuss the home invasion. Jason Mitchell arrived at the meeting wearing a bulletproof vest and carrying a firearm in his pants. The bulletproof vest was later found in the Tempo. The firearm was later found discarded in someone's backyard. When Jason Mitchell arrived at the meeting location, there was also a loaded assault rifle in the back of his mother's car.

Third, the legislative sentencing guidelines prohibit a trial court from basing a departure on characteristics that are already accounted for in the scoring of the sentencing guidelines. They do not, however, prohibit a trial court from considering additional or other criminal conduct that is not accounted for by the guidelines. It has long been the rule in Michigan that, when sentencing a criminal defendant, a trial court may take into account facts underlying uncharged acts and acquittals. Here, the objective and verifiable facts upon which the trial court relied were not otherwise adequately accounted for by the guidelines, which did not reflect the violent acts that were precipitated by the home invasion offense.

Considering that the home invasion offense led to extensive violence resulting in the death of one individual, we find no abuse of discretion in the trial court's determination that the articulated reasons were substantial and compelling. In considering this issue, we disagree with Jason Mitchell that the trial court made an improper independent finding that he was guilty of crimes greater than those for which he was convicted. A trial court may not make an independent finding of guilt on a crime other than that for which the defendant is being sentenced. It may, however, account for facts underlying uncharged conduct and acquittals. At sentencing, the trial court acknowledged that Robert Mitchell was convicted of second-degree murder and that the jury must have rejected the theory that there was a planned ambush. The trial court subsequently ruled that it was not required to view the facts in the manner that the jury viewed them. The trial court's comments do not reflect that it made an improper independent finding that Jason Mitchell was guilty of other crimes. Rather, the trial court took into account the circumstances surrounding the home invasion, which led to a planned ambush at the restaurant.

We also disagree with Jason Mitchell's assertion that his sentence was not individualized. The trial court was familiar with Jason Mitchell's prior record, referred to it when sentencing him, and sentenced him for the charges upon which he was convicted. While the trial court addressed both Robert Mitchell and Jason Mitchell when making general comments at sentencing, it treated Jason Mitchell as a separate defendant when imposing sentence upon him. It considered the circumstances of the offense and the offender and it completed Jason Mitchell's sentencing before sentencing Robert Mitchell.

Finally, we are not persuaded that Jason Mitchell's sentence for home invasion violates the principle of proportionality. The sentence is proportional to the seriousness of the offense and the offender. Jason Mitchell broke into Phillip Patterson's home, stole several items, prompted a confrontation, and arrived at the arranged meeting place armed with a gun and wearing a bulletproof vest. Jason Mitchell's past criminal history demonstrated his complete disregard for the law. Moreover, the evidence at trial indicated that Jason Mitchell was a heavy influence over Robert Mitchell, who was several years younger, idolized Jason Mitchell, and would do anything for him. Jason Mitchell committed the second-degree home invasion, which led to Robert Mitchell's shooting of the Pattersons. Under the circumstances, the sentence is proportionate to the seriousness of the circumstances surrounding the offense and the offender.

(Op. at 8-10) (footnotes omitted).

Petitioner's application for leave to appeal to the Michigan Supreme Court raised the

same issues rejected by the Court of Appeals. (Application for Leave to Appeal, found in Supreme

Court record, docket # 37). By standard order entered February 27, 2004, the Michigan Supreme

Court denied discretionary review.

### C.    Motion for Post-conviction Relief and Applications for Appellate Review

On January 27, 2005, petitioner filed a motion in Kent County Circuit Court claiming

entitlement to post-conviction relief under Rule 6.500 of the Michigan Court Rules on three grounds:

1.    Defendant is entitled to relief from judgment where there is good cause for not raising the issues previously, the issues involve the denial of constitutional rights, defendant was prejudiced and manifest injustice resulted due to the ineffective assistance of appellate counsel.

2.    The trial court's denial of the motion for severance was an abuse of discretion and caused a violation of due process because prejudicial evidence relevant to co-defendant Robert Mitchell but not to defendant Jason Mitchell was heard by the jury shared by both defendants.

3.    The judicial determination to depart from the sentencing guidelines in this case violated the defendant's right to a jury determination for such findings where the alleged facts relied upon by the court were facts the prosecutor did not charge and prove beyond a reasonable doubt.

On February 8, 2005, Judge Kolenda entered his opinion and order denying petitioner's motion.

(2/8/05 Order, Pet. Ex. #3). Judge Kolenda found nothing improper in petitioner's joint trial with

his brother:

While defendant's brief asserts that joinder was improper for two reasons: because his and his brother's defenses were antagonistic and because highly adverse evidence admissible against only his brother was, by virtue of a single trial, also presented against him, the latter is the predicate for the former claim, making antagonism *the* basis for the claimed joinder error. Unquestionably, defendant's defense differed somewhat from his brother's defense, but that does not make them antagonistic, which is what requires separate trials. To be "antagonistic," defenses must be "mutually exclusive" or "irreconcilable" such that, in order to believe the core evidence offered by one defendant, the jury must disbelieve the core of the evidence offered by the co-defendant. *People v. Hana*, 447 Mich 325, 349, 350 (1994). Differing defenses do not mandate severance, *Id.*, at 341, nor do inconsistent

-25-

defenses. *Id.*, at 349. In these cases, the jury did not have to reject his brother's defense in order to believe defendant's, or vice versa. It could have believed both or disbelieved both.

(Op. at 2-3). He rejected petitioner's renewed challenge to his sentence because *Blakely v. Washington*, 542 U.S. 296 (2004), does not apply to Michigan's indeterminate sentencing scheme. (Op. at 3). Judge Kolenda held that appellate counsel had not been ineffective when he elected not to assert the meritless joint trial and *Blakely* issues. (Op. at 3).

Petitioner sought appellate review of the three issues he raised in his unsuccessful motion for post-conviction relief. On February 3, 2006, the Michigan Court of Appeals denied petitioner's application for leave to appeal because petitioner failed to meet his burden of establishing entitlement to relief under MCR 6.508(D). (2/3/06 Order, found in Michigan Court of Appeals record, docket # 38). On October 31, 2006, the Michigan Supreme Court denied leave to appeal because petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (10/31/06 Order, found in Michigan Supreme Court record, docket # 39). On December 4, 2006, petitioner filed his federal habeas corpus petition.

## Applicable Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005)

(citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Holder v. Palmer*, No. 07-1440, __ F.3d __, 2009 WL 4639654, at * 11 (6th Cir. Dec. 9, 2009) ("'[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

De novo review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) ("[W]hen a claim has not been adjudicated on the merits in State Court proceedings, and has not been procedurally defaulted, we look at the claim *de novo* rather than through the deferential lens of AEDPA.") (citations omitted); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the

state court decision was objectively unreasonable and not simply erroneous or incorrect."); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see*

*Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Tucker v. Palmer*, 541 F.3d 652, 665 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 109 (2009).

## Discussion

### I.    Sufficiency of the Evidence

In Ground I, petitioner argues that the evidence was insufficient to support the jury's verdict finding him guilty of second-degree home invasion. (Pet. at 9-12). Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a habeas petitioner challenging a state-court conviction "is entitled

to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324. In examining the sufficiency of the evidence to support a state conviction, this court must give deference to the fact-finder's determination, recognizing "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319. The evidence must be viewed in the light most favorable to the prosecution. *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002). This standard applies whether the evidence of guilt was direct or circumstantial. *Id.* The state need not rule out every hypothesis except guilt, nor need the habeas court be persuaded of guilt beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499-500 (6th Cir. 2007).

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove "all elements of the offense charged, and must persuade the fact finder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (internal citations omitted). Therefore, in reviewing the sufficiency of the evidence to support a jury's verdict, this court must "do so 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007) (quoting *Jackson*, 443 U.S. at 324 n.16.).

The Michigan Court of Appeals ruled directly on this claim. Accordingly, this court's review of the issue must be conducted under AEDPA standards, which the Sixth Circuit has described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of the evidence under AEDPA proceeds under the "unreasonable application" prong of the statute. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). In other

words, such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of the standard of *Jackson v. Virginia*. *See Eady v. Morgan*, 515 F.3d 587 (6th Cir. 2008). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007). This standard presents a "very difficult hurdle" for the habeas petitioner. *Id.* at 437.

Michigan defines the crime of second-degree home invasion as follows:

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the second degree.

Mich. Comp. Laws § 750.110a(3). Petitioner claims that no reasonable trier of fact could have found him guilty of second-degree home invasion. The Michigan Court of Appeals disagreed, and it held that the evidence was sufficient to support the jury's verdict. Petitioner knew Phillip Patterson was away from his apartment. The apartment door was locked. Petitioner did not have permission to enter. Phillip Patterson was only away from his apartment for a short time. Darnell Triggs parked outside the apartment. Petitioner left the car empty-handed, returned about ten minutes later with a bag that he placed on the floor, and told Triggs to "take off." Phillip Patterson saw petitioner and Triggs trying to leave the alley. When Phillip Patterson returned home, he found the door wide open. The apartment had been ransacked and several items were missing. Further, there was significant evidence regarding petitioner's effort to secure perjured testimony which was admissible as evidence of his consciousness of guilt. Petitioner asked Triggs to falsely testify that

they were "flagged down" in the alley by a man who attempted to sell petitioner a stereo. Alphonso

Edwards had been listed as one of petitioner's witnesses under his alias of Alvin Thomas, and he

planned to present perjured testimony in support of petitioner's false story until Detective Griffin

thwarted the plan. (Op. at 5). The decision of the Michigan Court of Appeals was not an

unreasonable application of the *Jackson v. Virginia* standard.

## II.    Rebuttal Evidence

In Ground II, petitioner claims that Mary Goree's rebuttal testimony deprived him of

a fair trial. (Pet. at 12-16). The Michigan Court of Appeals rejected this argument, finding that

petitioner and his brother had attempted to portray themselves as loving brothers who looked out for

each other and were not violent. They attempted to discredit Darnell Triggs's testimony. Trudy

Mitchell, petitioner's grandmother, had testified that there was no reason why Triggs should fear

petitioner other than Triggs's paranoia. In rebuttal, Ms. Goree testified that she had recently

witnessed petitioner brutally pistol-whipping her boyfriend Benjamin Clark. Ms. Goree's rebuttal

testimony was responsive to petitioner's theories, showed that petitioner had a gun, that the

petitioner and Robert Mitchell were far more dangerous and violent than they had attempted to

portray themselves, and that Darnell Triggs had very real and substantial reasons to fear for his

personal safety. (Op. at 10-11).

Petitioner's continued disagreement with the trial court's evidentiary ruling does not

provide a basis for habeas corpus relief. The extraordinary remedy of habeas corpus lies only for a

violation of the federal Constitution or laws. 28 U.S.C. § 2254(a). As the Supreme Court explained

in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or

improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due-process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007), *cert. denied*, 128 S.Ct. 1704 (2008). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Bey*, 500 F.3d at 521; *Seymour*, 224 F.3d at 552. Further, under the AEDPA, the court may only grant relief if a petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Bey*, 500 F.3d at 521-22; *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner falls well short of satisfying this difficult standard. There is no clearly established Supreme Court precedent which holds that it is a violation of due process to admit rebuttal evidence under the circumstances presented. I find that Ground II is meritless.

### III.    Prosecutorial Misconduct

In Ground III, petitioner argues that prosecutorial misconduct during closing argument deprived him of a fair trial in violation of his Fourteenth Amendment rights.[6] (Pet. at 8-11). He

---

[6] Petitioner invokes Sixth Amendment rights under the "State and Federal Constitutions." (Pet. at 11). Sixth Amendment rights are applicable to the States by incorporation through the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668,

argues that the prosecutor: (A) shifted the burden of proof; (B) argued facts not in evidence; (C) made "indirect references" to petitioner's failure to testify; and (D) made prejudicial comments to the jury suggesting that the prosecutor had personal knowledge regarding his guilt beyond the evidence admitted during his trial. The Michigan Court of Appeals rejected all these claims. Thus, deferential AEDPA standards apply.[7]

The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000). This court does "not possess supervisory powers over state court trials." *Id.* "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.' " *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) ("'[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181). To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. "'[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor,' because 'the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Beuke v. Houk*, 537 F.3d 618, 646

---

684-85 (1984); *Rockwell v. Yukins*, 341 F.3d 507, 518 (6th Cir. 2003). His state-law claims do not provide a basis for granting federal habeas corpus relief. 28 U.S.C. § 2254(a).

[7] In *Flemming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009), the Sixth Circuit held that federal constitutional claims reviewed for plain error by a state court are claims adjudicated on the merits and are entitled to review under AEDPA standards.

(6th Cir. 2008) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Even if the prosecutor's conduct was improper or "universally condemned," the habeas court can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

The first question for the habeas court is whether the prosecutor's statement was misconduct at all. *West v. Bell*, 550 F.3d at 566. If so, the court is to examine four factors in determining whether the impropriety was "flagrant": (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *Id.*; *see Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)). Under AEDPA, this bar is heightened by the deference that the court must accord state-court rulings. *Bowling*, 344 F.3d at 513.

### A.   Shifting the Burden of Proof

The Michigan Court of Appeals held that the prosecutor's rebuttal was fair comment. It did not shift the burden of proof. The jury was instructed that the lawyer's arguments were not evidence and that it was the prosecution's burden to prove petitioner's guilt beyond a reasonable doubt. (TT III, 62-64; TT XI, 134, 145). The Court of Appeals held that, "the prosecutor's argument in her rebuttal did not deny Jason Mitchell a fair trial." (Op. at 7). The decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme

Court precedent, nor an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

### B. Arguing Facts Not in Evidence

Petitioner argues that the prosecutor's rebuttal argument contained facts that were not in evidence. Petitioner had a cut on his right hand when he was arrested. (TT VIII, 9-10). Expert testimony established the match between petitioner's DNA and the blood found on a napkin under the Tempo's front passenger seat. (TT VI, 136; TT VII, 188-98; TT VIII, 9-10). The towel that police found on Division Street carried a mixture of DNA from two donors and could not be matched to petitioner's DNA. (TT VII, 196). Petitioner's counsel made the following argument regarding the DNA evidence:

> They tested the towel for DNA purposes. They come to you and say, hey, we found this napkin with blood sample -- or blood dot in Jason Mitchell's car, and that napkin belongs to him because we have the DNA here. When in some way they pick out some blood -- we don't know if it is new or old, but they have a picture of [it] here, you don't think that DNA is probably going to be in that towel, also? He was the one running around with that towel on that day.

(TT XI, 91-92). The prosecutor gave this rebuttal:

> Now the napkin that's bloody with Jason's blood on it under the seat, what does that show you? No prints on the car. He had to be in the car at some point, right? At that point, we're building small building blocks toward what the truth is. And maybe that blood is on there because he's breaking in 30 minutes earlier, breaking into 29 Putnam and he cuts himself in the process of that. Maybe that's why its there. Can I prove it to you. No.

(TT XI, 102-03). There was nothing improper in the prosecutor's rebuttal. The prosecutor is entitled to argue reasonable inferences from the evidence. *See Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005). Petitioner had a cut on his hand. His blood was circumstantial evidence that he was a passenger inside the Tempo and that he was bleeding. The prosecutor expressly acknowledged that

she could not prove that petitioner sustained the cut while invading Phillip Patterson's locked apartment, but it was one plausible explanation for the physical evidence. Furthermore, the allegedly offending argument was isolated and the other evidence against petitioner was overwhelming. Nothing in this rebuttal deprived petitioner of a fair trial. The decision of the Michigan Court of Appeals rejecting petitioner's argument easily withstands scrutiny under 28 U.S.C. § 2254(d).

C.      <u>"Indirect" References to Petitioner's Failure to Testify</u>

Next, petitioner argues that the prosecutor referred to the evidence presented against him as being uncontroverted, unchallenged, and undisputed in her "effort to make an indirect reference to Petitioner's constitutional right not to testify." (Pet. at 9). Petitioner cannot possibly obtain federal habeas corpus relief on this ground. The decision of the Michigan Court of Appeals rejecting this claim was not an unreasonable application of clearly established law as determined by the Supreme Court of the United States, nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

The Fifth Amendment's Self-incrimination Clause guarantees "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. It applies to criminal proceedings in Michigan courts through the Fourteenth Amendment's Due Process Clause. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *Malloy v. Hogan*, 371 U.S. 1 (1964). In *Griffin v California*, the Supreme Court found that a prosecutor's argument that the jury should consider the defendant's failure to testify as evidence of his guilt violated the defendant's rights under the Self-incrimination Clause. Eddie Griffin had been seen with the victim on the evening of her death and evidence placed him in the area where the body was found. In closing argument, the prosecutor repeatedly "made much of" the defendant's failure to testify:

The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her.

What kind of a man is it that would want to have sex with a woman that beat up if she was beat up at the time he left?

He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. He would know how long he was with her in that box. He would know how her wig got off. He would know whether he beat her or mistreated her. He would know whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman.

These things he has not seen fit to take the stand and deny or explain.

And in the whole world, if anybody would know, this defendant would know.

Essie Mae is dead, she can't tell you her side of the story. The defendant won't.

380 U.S. at 610-11. This argument was exacerbated by the judge's instruction that the jury could consider the defendant's failure to testify as evidence of his guilt. *Id.* at 610. The Supreme Court held that the Self-incrimination Clause "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615.

The Supreme Court has never held that it is a Fifth Amendment violation for the prosecutor to refer to evidence as undisputed or uncontradicted. *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009). The absence of a violation of clearly established federal law as determined by the Supreme Court is fatal to petitioner's claim under AEDPA standards. AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412.

During the decades after the Supreme Court's *Griffin* decision and before AEDPA went into effect, the Sixth Circuit developed a substantial body of law regarding "indirect" argument

by a prosecutor regarding a defendant's failure to testify. *See, e.g., Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988); *Raper v. Mintzes*, 706 F.2d 161 (6th Cir. 1983); *Butler v. Rose*, 686 F.2d 1163 (6th Cir. 1982) (*en banc*). The most important of these cases was the Sixth Circuit's *en banc* decision in *Butler v. Rose*. In *Butler*, the Court of Appeals observed that the comments "by the court and the prosecutor [at issue in *Griffin*] were direct and adverse." *Butler*, 686 F.2d at 1169. The Sixth Circuit acknowledged that "it was the [] group of cases -- those cases where it had been alleged that statements constituted indirect adverse comments on a defendant's failure to testify -- which ha[d] given the lower federal courts problems." *Id.* at 1170. It rejected the petitioner's argument that a prosecutor's statements that the defendant called no witnesses or that the State's evidence was uncontradicted was always impermissible where the defendant was the only person who could have offered contradictory evidence because it would be "contrary to the teachings of *Lockett v. Ohio*."[8] The Sixth Circuit adopted for use in its habeas cases a test that it had applied in the direct review context: "whether the language used was manifestly intended to be or was of such character that the jury would naturally and necessarily take it to be comment on the failure of the accused to testify." *Butler*, 686 F.2d at 1170 (citing *United States v. Wells*, 431 F.2d 434 (6th Cir. 1970)). *Butler* and progeny direct lower courts to conduct a "probing analysis" of the context of the prosecutor's argument utilizing these four factors:

> (1) Were the comments "manifestly intended" to reflect the accused's silence or of such a character that the jury would "naturally and necessarily" take them as such;

_____

[8] In *Lockett v. Ohio*, 438 U.S. 586 (1978) the Supreme Court rejected a claim that the prosecutor's repeated references in closing argument to evidence as unrefuted and uncontradicted violated Lockett's Fifth and Fourteenth Amendment rights. The Court determined that Lockett's counsel had already focused the jury's attention on her silence in the opening statement and in indicating in front of the jury that she would be the next witness. *Id.* at 595.

-40-

(2) Were the remarks isolated or extensive;

(3) Was the evidence of guilt otherwise overwhelming; [and]

(4) What curative instructions were given, and when.

*Byrd*, 209 F.3d at 533-34 (quoting *United States v. Moore*, 917 F.2d 215, 225 (6th Cir.1990)). These four factors are essentially duplicative of the factors the Sixth Circuit uses to evaluate other types of alleged prosecutorial misconduct. *See West v. Bell*, 550 F.3d at 566.

*Butler* and other pre-AEDPA cases are discussed herein because the Sixth Circuit continues to apply the four-factor "probing analysis" it developed in its supervisory role to habeas cases under AEDPA where the petitioner claims prosecutorial misconduct involving "indirect" references to his failure to testify. *See Webb*, 586 F.3d at 396; *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003)(quoting *Lent*, 861 F.2d at 975); *Byrd v. Collins*, 209 F.3d 486, 533-34 (6th Cir. 2000)(quoting *United States v. Moore*, 917 F.2d 215, 225 (6th Cir. 1990)); *accord Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006)(quoting *Byrd*, 209 F.3d at 534). *Webb*, the most recent Sixth Circuit decision, acknowledges that *Griffin* did not establish a constitutional rule prohibiting the prosecution from describing evidence as uncontradicted, even in instances where only the defendant could have offered contrary testimony. 586 F.3d at 397. The *Webb* decision emphasized the formidable barrier faced by a habeas petitioner claiming an unreasonable application of the Supreme Court's *Griffin* decision. 586 F.3d at 396-97. The Sixth Circuit's *Joseph*, *Bowling*, and *Byrd* decisions did not focus on the absence of clearly established Supreme Court precedent, but instead in each case held that the habeas petitioner was not entitled to relief because there was no "manifest intent" by the prosecutor to draw the jury's attention to the petitioner's failure to testify, the remarks were isolated, and the evidence of the petitioner's guilt was strong. *See Joseph*, 469 F.3d at 474;

*Bowling*, 344 F.3d at 514; *Byrd*, 209 F.3d at 533-34. These Sixth Circuit cases make clear that a petitioner claiming that an improper "indirect" reference to his failure to testify deprived him of a fair trial faces an uphill battle. "General references to evidence as uncontroverted, while not recommended, may not reflect on the defendant's failure to testify where witnesses other than the defendant could have contradicted the evidence." *Byrd*, 209 F.3d at 534; *see Joseph*, 469 F.3d at 474. Prosecutors remain free to "summarize the evidence and comment on its quantitative and qualitative significance." *Bowling*, 344 F.3d at 514. Prosecutors also have 'leeway' during their summation to argue reasonable inferences from the evidence." *Webb*, 586 F.3d at 396-97.

Here, the prosecutor's rebuttal argument, when viewed in context,[9] was not misconduct:

> As you sit there right now you know Jason committed this home invasion, second degree. And the elements of that charge are easy. Did he break and enter or go in without permission to PJ's house. And did he steal something or intend to steal something while he was there? That's it.
>
> What evidence do we have to prove beyond a reasonable doubt that he committed the home invasion second? Well, it is circumstantial, initially? Yes, it is. And I've talked to you a little bit about circumstantial evidence when you were first picked. Remember? We talked about there's physical evidence, there's testimony, and there's circumstantial evidence. And you told me you could use any type of those evidence [sic] as long as it convinced you beyond a reasonable doubt. As long as there's quality, right? Doesn't matter what kind.
>
> How did we prove beyond a reasonable doubt that Jason committed that home invasion? We know from the testimony of PJ, George Woods, as well as the Stricklands [Edward and Earnie], that that red Tempo was over there. *Undisputed, okay? There's no evidence to the contrary. It is also undisputed that Jason Mitchell is the person that got in the passenger side of that car.* And where did he come from? He came from by Willie's [sic] house, along side of the garage. There is nothing else between the garage and the house. Nothing else. No other reason to go in that back yard. none. And there was no legitimate reason given to you, was there.

---

[9] Petitioner emphasizes only the italicized portion of the prosecutor's closing argument

What else do you have? You have Darnell Triggs. If Darnell was going to lie for somebody, is he going to lie for us or is he going to lie for his family? You know from your common sense and life experiences that if Darnell could help him out in that situation, make it better for him, he would do it. He's their cousin.

Do you think Darnell has a hard time living in that family right now? You better believe it. What he did was not an easy thing. And he told you he never would have done it -- he never would have snitched on his cousins, his relatives, his family, except what? They came after him. I think his words were, "They tried to take me out." Right? He was scared. He was scared enough to make a decision to maybe give up his family to save his own life and go to the police. And he still is.

And what did he tell them about the home invasion? He told them, Yep. He confronted with PJ and Woods, and Strickland said all along they saw Jason running from alongside that garage and jump in that red car to get out of there. And he told you something even more important. He told you when Jason left the car, he had nothing in his hands. And when he came back to the car, in the area towards PJ's house, what did he have? A bag with somethin' in it. He didn't have it when he left that car. Common sense tells you he took something and he took it from that house because there is no other explanation. The only other explanation they offer you is what? Alvin Thomas, a/k/a Alphonso Edwards, whichever is his real name, friend of the family, lives in his mom's basement. We know there are letters from Jason that are evidence that say to Robert, "I got a plan. Stay off the phones. Keep cool. I got a plan." Part of that plan was to save his behind (indicates) Jason's. This is Alvin Thomas, Alphonso Edwards-guy. You know if you -- if the facts don't -- aren't in your favor, if its -- you know, if the truth hurts, lie. Make somethin' up.

The fact that Jason Mitchell would conspire with his brother or conspire with his mother in letters he wrote her, tellin' her in detail and on the phone about this stereo scam -- of where it happened and where it needs to be said that they got it, and what time it occurred, and that it occurred in the alley and on a certain day, and to get somebody to do it. And they got somebody, and you saw him.

* * *

And after Thomas told us, "Look, I'm not going to testify at all. Don't worry about me. I'm not going to testify at all. They put me on to this, their family did, but it was Oscar, Joyce or whomever, but I'm not going to testify anymore. Don't worry, but, yeah, they were gonna have me say, this, this, and this. But it's all a lie. I was never out there on that day. In fact, I brought the lawyer -- Jason's lawyer a stereo -- gave it to Joyce to give to the lawyer." What, two, three weeks ago? Is that what he said? A few weeks ago.

So he still had this supposed stereo that Jason picked up in the alley that day, three weeks ago. And never was there in the alley to give it to Jason. That fact alone screams at you. The evidence tells you, and its just as good or better than any evidence on the home

invasion, because it yells at you, if he gave a legitimate reason to be there? Tell us. If he committed a crime, you need an excuse or an alibi, then they better come up with it, and that's exactly what they did. They got that part.

(TT XI, 5-9). The above-quoted argument was not manifestly intended to highlight petitioner's failure to testify at trial, nor would the jury have understood it as such. The prosecutor's remarks were not misconduct. The closest the prosecutor came to committing misconduct was her use of the phrase "tell us." However, the context in which she used it shows that it was her rebuttal reminding the jury that defense counsel's closing argument (TT XI, 80-95) offered no competing reason or reasons why petitioner would leave Triggs in the alley behind Phillip Patterson's apartment and return carrying a bag a few minutes later. All of the evidence showed that the stereo story was a lie. Petitioner tried to persuade Darnell Triggs to commit perjury and Alphonso Edwards admitted that the story of giving petitioner a stereo was an utter fabrication. (TT XI at 5-9).

Even assuming *arguendo* that the prosecutor made an improper comment in violation of the Fifth Amendment, harmless error analysis applies. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). In *Fry*, the Supreme Court held that, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman [v. California*, 386 U.S. 18 (1967)]." 551 U.S. at 121-22 (citations omitted). Under the *Brecht* standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry*, 511 U.S. at 116 (quoting *Brecht*, 507 U.S. at 631). The evidence against petitioner was overwhelming and the allegedly offending arguments by the prosecutor were isolated. The purported violations of

petitioner's Fifth Amendment rights were insubstantial and did not have a substantial and injurious effect or influence on the jury's verdict.

      D.    <u>Vouching</u>

Petitioner's remaining claim of prosecutorial misconduct is that a portion of the prosecutor's rebuttal argument (TT XI, 102-04) "diverted the jury from its duty by intimating that [the prosecutor's] office had personal knowledge that the jury was not pri[vy] to make it appear that incriminating evidence was 'destroyed' that would have proven 'beyond a reasonable doubt' that Petitioner committed a greater offense than what he was charged with." (Pet. at 10-11). This argument cannot withstand scrutiny.

Petitioner's argument ignores the threshold question whether the due-process right he claims has been clearly established by decisions of the United States Supreme Court. 28 U.S.C. § 2254(d). Although the Supreme Court has recognized that certain prosecutorial misconduct, if severe and pervasive, can violate the Due Process Clause, *see, e.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (presentation of knowingly false testimony), the Supreme Court has never condemned under due-process principles prosecutorial "vouching." The Court's only occasion to opine in this area arose in a federal prosecution in which the prosecutor shared with the jury his "personal impression" that the defendant intended to commit fraud. *United States v. Young*, 470 U.S. 1 (1985). Examining the totality of the proceedings, the Court refused to find that the prosecutor's remark constituted plain error. In reaching this conclusion, the Court said that a prosecutor violates rules of professional conduct by expressing his personal belief as to the truth or falsity of any testimony or evidence of the guilt of the defendant. 470 U.S. at 7. The Court nevertheless refused to find plain error. Two observations must be made concerning

the sufficiency of the *Young* decision to satisfy AEDPA's requirement that a constitutional right be clearly established by holdings of the Supreme Court. First, the *Young* Court was not engaged in constitutional adjudication, but was merely reviewing a federal trial for the presence of plain error. The Court did not cite the Due Process Clause or any of its cases decided thereunder. Although the Court said that vouching can be unprofessional, it has never said that vouching is unconstitutional. Second, the Court's comments concerning this particular species of prosecutorial misconduct were clearly dictum, as the Court went on to hold that the prosecutor's error, whatever it may have been, did not affect the fundamental fairness of the trial. 470 U.S. at 20, 105 S.Ct. 1038. Consequently, petitioner cannot point to any Supreme Court holding that condemns "vouching" under federal constitutional principles. Petitioner's argument falters on the first step of the AEDPA analysis.

Assuming *arguendo* that standards announced in lower federal courts could be applied in this context, the result would not be altered. No improper "vouching" occurred. The lower federal courts have generally condemned vouching by the prosecutor, and often analyze the issue under federal due-process principles. *See, e.g.*, *Washington v. Hofbauer*, 228 F.3d 689, 700-01 (6th Cir. 2000). Lower federal courts have generally recognized two types of objectionable vouching. The first type impermissibly places the government's prestige behind the witness to bolster the witness's credibility. *See United States v. Jackson*, 473 F.3d 660, 670 (6th Cir. 2007); *United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004). In the second type of impermissible vouching, also known as "bolstering," the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See United States v. Jackson*, 473 F.3d at 670; *United States v. Owens*, 426 F.3d 800, 807 (6th Cir. 2005); *see also Davis v. Baker*, No. 09-1140, slip op. at 9-10 (6th Cir. Dec.

15, 2009) (citing *United States v. Francis*, 170 F.3d 550 (6th Cir. 1999)).  Neither principle forbids a prosecutor from making reasonable arguments as to witness credibility on the basis of the evidence. *See Green v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001).

Petitioner argues that the prosecutor's rebuttal constituted bolstering.  (Pet. Brief at 20-21).  It is clear that no bolstering occurred.  Petitioner's counsel argued in his closing that the prosecutor did not come forward with evidence proving that petitioner and his brother conspired to ambush Willie and Phillip Patterson.  Defense counsel's argument invited the prosecutor's rebuttal that petitioner was not on trial for conspiring to kill Willie Patterson.  *See  Byrd v. Collins*, 209 F.3d at 535; *see also Smith v. Jones*, 326 F. App'x 324, 328 (6th Cir. 2009).  The prosecutor admitted that she could not prove that petitioner conspired with his brother to kill Willie Patterson or even knew that "it was going to go down before it did."  (TT XI at 103).  She stated, "[F]rom the evidence, we can't do that.  The evidence that we have, the evidence that wasn't destroyed, the testimony that people are willing to give us, I can't' prove it.  I can prove beyond a reasonable doubt what he's charged with now, based on the evidence and the law."  (*Id.* at 104).  This was the opposite of bolstering.  Rather than suggesting that she had evidence of criminality not produced to the jury, the assistant prosecutor expressly disavowed any intention to hold petitioner responsible for uncharged crimes.  This rebuttal was not misconduct and it did not deprive petitioner of a fair trial.

In summary, the decision of the Michigan Court of Appeals rejecting all petitioner's prosecutorial misconduct claims was not an unreasonable application of clearly established Federal law as determined by the Supreme Court, nor was it an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

## IV.     Denial of Motion to Sever

In Ground IV, petitioner argues that his rights under the Fourteenth Amendment's Due Process Clause were violated because he and his brother had a joint trial.  (Pet. Brief at 22-25). He argues that his defense and his brother's defense were "antagonistic" and that he was prejudiced because Regina McNairy and Leisa Mitchell testified that Robert Mitchell viewed him as a father figure, and because Robert Mitchell made "several admissions, via written letters, that would not have been admissible against Petitioner before a separate jury."  (*Id.*).  I find that Judge Kolenda's decision rejecting this claim easily passes review under deferential AEDPA standards.  28 U.S.C. § 2254(d)(1).

There is no decision of the United States Supreme Court clearly establishing a right under the Due Process Clause to separate trials or juries.  Joint trials play a vital role in the criminal justice system.  *Richardson v. Marsh*, 481 U.S. 200, 209 (1987).  Joint trials generally serve the interests of justice by avoiding inconsistent jury verdicts and facilitating the efficiency and fairness of the criminal justice system.  *Id.* at 209-10.

The Supreme Court has delineated few constitutional rules in this area.  The Court has held that separate trials are constitutionally required where the prosecution intends to introduce the confession of a co-defendant which incriminates another defendant.  *See Bruton v. United States*, 391 U.S. 123, 137 (1968). The *Bruton* rule is designed to vindicate a defendant's right to confront his accusers, so separate trials are not necessary when the co-defendant is subject to cross-examination.  There was no Confrontation Clause problem during petitioner's trial because Robert Mitchell testified and was subjected to cross-examination.  Beyond the *Bruton* rule, the Supreme Court has left the matter of severance to state law and the trial judge's discretion.  The

Court remarked in *United States v. Lane*, 474 U.S. 438 (1986), that the denial of a motion for severance does not in and of itself implicate constitutional rights. The Constitution is implicated only when the failure to sever trials is so prejudicial that it imperils a defendant's right to a fair trial. 474 U.S. at 446 n.8. Consequently, a "petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendants bears a very heavy burden." *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).

The Supreme Court's decision in *Zafiro v. United States*, 506 U.S. 534, 539 (1993), is sometimes erroneously cited as establishing constitutional standards for separate trials. The Sixth Circuit, however, recognizes that the Court's *Zafiro* decision is based on the Federal Rules of Criminal Procedure, not constitutional grounds. *See Phillips v. Million*, 374 F.3d 395, 398 (6th Cir. 2004) ("*Zafiro* involved the interpretation of Federal Rules of Criminal Procedure 8, 14, and 18, not the United States Constitution."). In *Zafiro*, the Supreme Court declined to adopt a "bright line" rule requiring severance whenever co-defendants have conflicting defenses. 506 U.S. at 538. "Mutually antagonistic defenses are not prejudicial *per se*. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at 538-39. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. Further, the Supreme Court noted that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* "Juries are presumed to follow their instructions." *Id.* at 540. "It is well settled that defendants are not entitled to severance merely because they have a better chance of acquittal in separate trials. *Id.* at 540. "A fair trial does not

include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did not sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." *Id.* at 540.

Petitioner's argument that he was denied a fair trial because he was tried with Robert Mitchell is utterly devoid of merit. No objection was offered during the brief testimony of witnesses Leisa Mitchell (TT X, 3-6) and Regina McNairy (TT X, 70-76). The testimony of these witnesses simply echoed Robert Mitchell's testimony that he viewed petitioner as a father figure and did nothing to deprive petitioner of a fair trial. Petitioner argues, "Evidence was also presented at trial indicating that Robert had made several admissions, via written letters, that would not have been admissible against Petitioner before a separate jury." (Pet. Brief at 24). This undeveloped argument claiming that evidence admitted in the joint trial would have violated the Michigan Rules of Evidence if there had been separate trials cannot possibly provide a basis for disturbing petitioner's criminal convictions. Petitioner is apparently alluding to Robert Mitchell's letters to their mother asking her to persuade Darnell Triggs to lie. The letters were used to impeach Robert when he denied trying to influence Triggs's testimony. (TT X, 25-27). No objections were made at any time during Robert's testimony. (TT X, 6-69). Petitioner suffered no prejudice because the jury already knew from Triggs's testimony that petitioner made a telephone call to Triggs and attempted to convince Triggs to lie. The jury also had Alphonso Edwards's testimony regarding the effort to convince him to commit perjury. Petitioner benefitted from his brother's testimony. Robert testified that he did all the shooting and that petitioner never asked him to do it. (TT X, 65). He testified that petitioner did not have a gun. (TT X, 23-24, 39). Robert Mitchell testified that Darnell Triggs's

"head is messed up." (TT X, 24). He described Triggs as a heavy drinker and explained that Triggs takes a significant amount of prescription medication and is easily influenced. (TT X, 68). The defenses asserted by petitioner and his brother were not antagonistic. Petitioner's defense was that the prosecution had not shown beyond a reasonable doubt that he was guilty of the second-degree home invasion and the other charges. Robert's defense was that he shot Willie Patterson while defending petitioner and that he did not recall shooting Phillip Patterson. Even if the defenses had been antagonistic, the jury received instructions that the fact that two defendants were being tried was not evidence of anything, and each defendant was entitled to the presumption of innocence on all charges. (TT III, 68). The jury was instructed that it was required to consider each charge separately. (TT XI, 142). A trial with Robert Mitchell as his co-defendant did not deprive petitioner of a fundamentally fair trial. Ground IV does not provide a basis for disturbing petitioner's convictions.

## V. Eighth Amendment Claim

In Ground V, petitioner argues that his sentence of 12-to-22 years' imprisonment as a habitual offender, second-felony offense, on his second-degree home invasion conviction violated his Eighth Amendment rights under the Cruel and Unusual Punishments Clause. The Michigan Court of Appeals held that petitioner's sentence was proportional to the seriousness of the offense and the offender. Petitioner "broke into Phillip Patterson's home, stole several items, prompted a confrontation, arrived at the arranged meeting place armed with a gun and wearing a bulletproof vest." (Op. at 9). Petitioner's criminal history "demonstrated his complete disregard for the law." (*Id.*). Petitioner "committed the second-degree home invasion, which led to Robert Mitchell's shooting of the Pattersons." (*Id.*). The Michigan Court of Appeals cited its own decision in *People*

*v. Babcock*, 648 N.W.2d 221, 223 (Mich. Ct. App. 2002)("*Babcock II*"). *Babcock II* was decided

on state-law proportionality grounds. *See People v. Milbourn*, 416 N.W.2d 1 (Mich. 1990); *see also*

*People v. Hegwood*, 636 N.W.2d 127, 130-31 (Mich. 2001). Because the Michigan Court of

Appeals did not address the merits of petitioner's Eighth Amendment claim, a *de novo* standard of

review applies.

The Supreme Court has held that the Eighth Amendment's prohibition against cruel

and unusual punishments does not require strict proportionality between the crime and the sentence.[10]

*See Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) (plurality). Rather, it forbids "extreme

sentences" that are grossly disproportionate to the crime. 501 U.S. at 1001. Addressing the state of

its previous holdings in this area for purposes of AEDPA analysis, the Court has recently observed

that "our precedents in this area have not been a model of clarity." *Lockyer v. Andrade*, 538 U.S.

63, 72 (2003). In *Lockyer*, the Court indicated that one governing legal principle qualifies as "clearly

established" for purposes of section 2254(d)(1): "A gross disproportionality principle is applicable

to sentences for terms of years." *Id.*; *accord Ewing v. California*, 538 U.S. 11, 20 (2003) (the Eighth

Amendment contains a "narrow proportionality principle" that applies to noncapital sentences). The

*Lockyer* Court conceded that beyond this narrow holding, its previous decisions "exhibit a lack of

clarity regarding what factors may indicate gross disproportionality." *Lockyer*, 538 U.S. at 72.

---

[10] Habeas relief is available only on the ground that a petitioner is being held in custody in violation of the federal Constitution or laws. 28 U.S.C. § 2254(a). A habeas court cannot release a state prisoner on the ground that the conviction or sentence violates state law. *See Estelle v. McGuire*, 502 U.S. at 67. *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. April 21, 1995); *Ferguson v. Curtin*, No. 1:09-cv-330, 2009 WL 2905563, at * 6 (W.D. Mich. Sept. 4, 2009). As the *Milbourn* rule is one of state law, it is not a ground for habeas corpus relief. The Supreme Court has squarely held that a state prisoner is not entitled to federal habeas relief because of the alleged violation of a state-law rule of proportionality. *Lewis v. Jeffers*, 497 U.S. 764 (1990).

The Supreme Court's jurisprudence in this area provides no support for petitioner's contentions. *See, e.g., Lockyer*, 528 U.S. at 66 (two consecutive terms of 25 years to life for third-strike conviction was not contrary to or an unreasonable application of clearly established principles of proportionality); *Harmelin*, 501 U.S. at 961 (life in prison without parole for possessing over 650 grams of cocaine did not raise an inference of gross proportionality, even for first-time offender); *Rummel v. Estelle*, 445 U.S. 263, 264-65 (1980) (life in prison without parole for three-time offender does not violate Eighth Amendment). Petitioner's sentence was not grossly disproportionate to his crime and history as a habitual offender.[11] In the absence of a finding of gross disproportionality, Eighth Amendment analysis of a noncapital sentence ends.

Petitioner's arguments that Judge Kolenda erred in his application of Michigan's sentencing guidelines (Pet. Brief at 26-30) are state-law claims that do not provide a basis for federal habeas corpus relief. 28 U.S.C. 2254(a). The Michigan sentencing guidelines are designed to guide the exercise of trial-court discretion in the setting of a minimum sentence. MICH. COMP. LAWS § 769.34. The trial judge may depart from the recommended guideline range, as long as the judge articulates "substantial and compelling" reasons for the departure. A Michigan judge's decision in scoring the state guidelines is a pure issue of state law and does not raise a federal question. *See Tironi v. Birkett*, 252 F. App'x 724 (6th Cir. 2007); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003); *Austin v. Jackson,* 213 F.3d 298, 301 (6th Cir. 2000). The state sentencing judge's adherence or nonadherence to the guideline range is therefore a matter without constitutional significance.

---

[11] "[S]uccessful challenges based on proportionality are 'exceedingly rare,' and deference is due legislative judgments on such matters." *Taylor v. Lewis*, 460 F.3d 1093, 1098 (9th Cir. 2006)(quoting *Solem*, 463 U.S. at 289-90). "A sentence within the statutory maximum set by statute does not generally constitute 'cruel and unusual punishment.'" *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000). "[A] State is justified in punishing a recidivist more severely than it punishes a first offender." *Solem*, 463 U.S. at 296.

**VI.     Judicial Fact-finding in Violation of *Blakely v. Washington*, 542 U.S. 296 (2004)**

In Ground VI, petitioner argues that his sentence was based on judicial fact-finding in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). Judge Kolenda was correct when he found that this claim was meritless. In Michigan, the maximum sentence is established by statute, not by the trial judge. Because Michigan's sentencing system involves indeterminate sentencing, in which the maximum is set by law, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny do not apply. *See Blakely v. Washington*, 542 U.S. at 308-09 (indeterminate sentencing system does not invade the province of the jury); *see also Tironi v. Birkett*, 252 F. App'x 724 (6th Cir. 2007) ("Tironi's sentence does not violate *Blakely v. Washington* . . . because *Blakely* does not apply to Michigan's indeterminate sentencing scheme."), *cert denied*, 128 S. Ct. 1898 (2008).

Petitioner's sentence did not exceed the prescribed statutory maximum of 22½ years' imprisonment authorized by the jury's verdict. The statutory maximum sentence for the crime of second-degree home invasion is 15 years, MICH. COMP. LAWS 750.110a(5), and under the habitual offender statute, MICH. COMP. LAWS 769.10(1)(a), the court was authorized to sentence petitioner up to 1.5 times the otherwise applicable maximum sentence. The Sixth Circuit recently gave this succinct explanation why a sentence at or below the statutory maximum does not violate the Sixth Amendment:

> The Sixth Amendment jury trial right simply "ensure[s] that the defendant 'will never get more punishment than he bargained for when he did the crime' "; it does "not promise that he will receive 'anything less' than that." *Harris [v. United States]*, 536 U.S. [545, ] 566 [(2002)] (quoting *Apprendi*, 530 U.S. at 498, 120 S.Ct. 2348 (Scalia, J., concurring)). When Chontos violated § 750.520b, he bargained that, if a jury found him guilty, he could receive a maximum penalty of "any term of years." And regardless of the ways that judicial factfinding and Michigan's guidelines affected his minimum sentence, Chontos got no more than he bargained for. Chontos's sentence therefore survives Sixth Amendment scrutiny.

*Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009); *see Arias v. Hudson*, No. 08-4513, slip op. at 5 (6th Cir. Dec. 16, 2009).  The state-court decision rejecting Ground VI was correct and clearly passes review under AEDPA standards.  28 U.S.C. § 2254(a).

## VII.    Ineffective Assistance of Appellate Counsel

In Ground VII, petitioner claims ineffective assistance of appellate counsel as part of his effort to establish "cause" to excuse his procedural default on the joint trial (Ground IV) and *Blakely* (Ground VI) issues which he presented for the first time in his motion for post-conviction relief under the Michigan Court Rules.  (Pet. Brief at 37-43, docket # 2; Reply Brief at 21-25, docket # 41).  Although I have recommended that the petition be denied for lack of merit in all grounds, petitioner's procedural defaults not overcome by a showing of cause and prejudice or actual innocence provide an alternative basis for denying relief on Grounds III, IV, and VI.[12]

Petitioner's claim of ineffective assistance of appellate counsel is meritless.  Claims of ineffective assistance of appellate counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *See  Evitts v. Lucey*, 469 U.S. 387 (1985).  Petitioner must prove (1) that appellate counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome.  466 U.S. at 687-88.  In adjudicating the first prong of the standard, the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

---

[12] Ineffective assistance of appellate counsel could not possibly provide "cause" to excuse the petitioner's Ground III procedural defaults which were based on the lack of contemporaneous objections during his trial.  Petitioner has not, and cannot on this record, establish actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 326 (1995); *see also House v. Bell*, 126 S. Ct. at 2078.

The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.* Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." 466 U.S. at 690. In the case of appellate counsel, petitioner has no constitutional right to have every nonfrivolous issue raised on appeal. *Jones v. Barnes*, 463 U.S. 745 (1983). Appellate counsel acts within the fair range of professional assistance when counsel chooses not to assert weak or unsupported issues on appeal. *See Smith v. Murray*, 477 U.S. 527, 536 (1986). Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel. *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy." *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52)). Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent ." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert. *Id.* The meritless *Blakely* and joint trial issues petitioner raised in his motion for post-conviction relief were not clearly stronger than the issues his appellate counsel raised. Appellate counsel has no duty to raise meritless issues. *Evitts*, 469 U.S. at 394; *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).

As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v.*

*Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694. Consequently, counsel's failure to raise an issue on appeal is ineffective

assistance "only if there is a reasonable probability that inclusion of the issue would have changed

the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). Petitioner does

not approach satisfying this demanding standard. Judge Kolenda's decision rejecting petitioner's

claims of ineffective assistance of appellate counsel was not an unreasonable application of clearly

established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d).


### Recommended Disposition

For the foregoing reasons, I recommend that the petition be denied.


Dated: December 21, 2009               /s/ Joseph G. Scoville
                                       United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).